AMERICAN STEVEDORING INC. AND RESOURCES WAREHOUSING & CONSOLIDATION SERVICES, INC., PLAINTIFFS *v.* U.S. CUSTOMS SERVICE, ANTHONY LIBERTA, REGIONAL COMMISSIONER OF CUSTOMS (REGION II), KATHLEEN M. HAAGE, AREA DIRECTOR OF CUSTOMS, NEWARK, NEW JERSEY, AMERICAN PRESIDENT LINES, LTD., EAST COAST WAREHOUSE & DISTRIBUTION CORP, RAIL HEAD TRANSFER, INC., CONTAINER FREIGHT SERVICES, INC., AND H & M INTERNATIONAL TRANSPORTATION, INC., DEFENDANTS

Court No. 94–04–00213

(Decided August 4, 1995)

*Gibney, Anthony & Flaherty (Wm. Lee Kinnally, Jr.* and *Robert L. Follick)* for the plaintiffs.

*Frank W. Hunger,* Assistant Attorney General; *Joseph I. Liebman,* Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, U.S. Department of Justice, Civil Division *(James A. Curley);* Office of Regional Counsel, U.S. Customs Service *(Frank C. Sharp),* of counsel, for defendants United States Customs Service, Anthony Liberta and Kathleen M. Haage.

*D'Amato & Lynch (Harvey Barrison* and *Mary Lee Cunningham)* for defendant East Coast Warehouse & Distribution Corp.

*Spadoro & Hilson (Arthur T. Hilson)* for defendant Rail Head Transfer, Inc.

*Bathgate, Wegener, Dugan & Wolf (William J. Wolf* and *Michael M. DeCicco)* for defendants H & M International Transportation, Inc. and American President Lines, Ltd.

*Haight, Gardner, Poor & Havens (John K. Weir* and *Judith K. Braun)* for defendant Container Freight Services, Inc.

## MEMORANDUM

AQUILINO, *Judge:* In the aftermath of this court's slip op. 94–69, 18 CIT 331, 852 F.Supp. 1067 (1994), which denied plaintiffs' preliminary application to (1) enjoin the U.S. Customs Service and its officers

Anthony Liberta and Kathleen M. Haage from relying on the other, named codefendants for centralized examination stations within the meaning of 19 C.F.R. Part 118 and (2) reinstate the station offered by Resources Warehousing & Consolidation Services, Inc., the government has interposed a motion for judgment on its agency's record or for summary judgment.[1]

The court's jurisdiction over this action is pursuant to 28 U.S.C. §§ 1581(i)(1) and (4) and 2631(i). The standard of review is prescribed by 28 U.S.C. § 2640(e) to be that of the Administrative Procedure Act, 5 U.S.C. § 706.

I

Section 118.1 of Title 19, U.S.C. defines a centralized examination station ("CES") as

a privately operated facility, not in the charge of a Customs officer, at which imported merchandise is made available to Customs officers for physical examination. A CES may be established in any port or any portion of a port, or any other area under the jurisdiction of a district director.

According to plaintiffs' complaint, approximately five years ago Customs designated twelve CESes in and around the port of Newark, New Jersey, one of which was operated by plaintiff Resources Warehousing & Consolidation Services, Inc. ("Resources"). Then on January 22, 1993 the Service published a final rule amending the regulatory framework of 19 C.F.R. Part 118 and Parts 151 ("Examination, Sampling, and Testing of Merchandise") and 178 ("Approval of Information Collection Requirements") to "allow Customs to better use its inspectional resources and clear higher volumes of cargo." 58 Fed.Reg. 5,596. This final rule was followed by New York Region Informational Pipeline No. 2266 (April 16, 1993), which advised the importing community that the CES selection process was being reopened for the Newark area and that all existing CESes therein had to reapply for selection by the Service, based upon the following stated considerations:

1. Due to the number of approved examination sites (i.e. Centralized Devanning Stations, CES's) currently in existence and their wide geographic dispersal, Customs has expended an excessive amount of time in traveling between facilities to perform examinations. This has negatively impacted Customs productivity, complicated efforts to match staffing with workload, and consequently, impeded Customs ability to provide a consistent level of service to the importing community. Responsive to the Trade community's service requirements, the Newark Area anticipates reducing the overall number of examination sites, recognizing that those sites

---

[1] Codefendants have submitted papers in support of the motion.

which are eventually approved must be geographically convenient to existing CDS's and CFS's.[2]

2. Once the CES approval process is completed, the existing 3 day examination scheduling window will be eliminated. Examinations will normally be scheduled within 24 hours of a shipment's arrival at the CES. CES operators will be required to provide Customs with a daily list of shipments available at their facilities for examination on the following day. Staffing can then be allocated according to workload with a high degree of assurance that freight will be readily accessible.

3. Contraband Enforcement Team (CET) examinations will require expedited movement for examinations. Consequently, due to the sensitive, priority nature of these examinations, CES operators will be responsible for arranging the expeditious movement of CET examination shipments from unlading sites to their CES facilities. Since CET examinations are usually more thorough and time consuming than other inspections, the expeditious movement of these shipments will be critical in facilitating the release of those found to be non-violative.

4. As a consequence of the anticipated reduction in the number of CES's, those sites which are approved must be able to accommodate a substantially greater volume of examinations, and provide facilities and support for an increased number of Customs personnel * * *.

That announcement established a calendar for submission of applications and public comments, listed the "minimum criteria to be considered as a CES", and specified the information an application had to contain. Finally, prospective applicants were advised that their responses to the following numbered specifications "shall constitute the criteria used to judge the application":

2. A description of the site's accessibility to major transportation arteries, rail lines, proximity to major ocean terminals, etc. and location within the port limits, and a floor plan of the facility actually dedicated to the CES operation showing bay doors, office space, exterior features, security features, and staging and work space;

3. A schedule of fees clearly showing what the applicant will charge for each type of service. Subject to any special costs incurred by the applicant such as facility modifications to meet specific cargo handling or storage requirements or to meet Customs security standards, the fees set forth in the schedule shall be comparable to fees charged for similar services in the area to be served by the CES. These charges will remain in effect unless the CES operator provides a 60 day notice to Customs of any proposed fee changes * * *.

4. A detailed list of equipment, which shows that the operator can make a diverse variety of cargo available for examination in an efficient and timely manner for containers, cartons, bales, bags, coils,

---

2 CDS is an acronym for a centralized devanning station, while CFS stands for container freight station.

refrigerated (reefer) cargo, garments on hangers, palletized cargo, bulk cargo, loose freight, etc.

\* \* \* \* \* \* \*

7. Any information showing the applicant's experience in international cargo operations and knowledge of Customs procedures and regulations, or a commitment to acquire that knowledge;

8. A description of available hardware and communication capabilities[.]

On July 30, 1993, Customs issued New York Region Informational Pipeline No. 2288, advising the importing community of receipt of some 17 CES applications[3] and soliciting written comments on them.

By letter dated February 4, 1994, the Service notified Resources that, although its "application, as presented, was found to satisfy the basic conditions set forth in \* \* \* Pipeline 2266, [it] was not selected to operate a CES."[4] A similar statement is found in a letter of rejection dated February 8, 1994 and sent to American Stevedoring Inc.[5] Those notifications were followed by New York Region Informational Pipeline No. 2315 (Feb. 9, 1994), publishing the names and addresses of the five firms selected to be the new CESes.

A

As a first cause of action, the complaint pleads, among other things, that Customs "acted arbitrarily and capriciously and disregarded the[ ] \* \* \* criteria set forth in 19 CFR § 118.11 and \* \* \* Pipeline No. 2266" [para. 28]; the "reasons cited \* \* \* in [the] February 4, 1994 letter denying Resources' CES application are unsubstantiated and unfounded" [para. 30]; and "[n]one of the five selected CES sites were in conformity with the published requirements within the allotted 30 day period" [para. 35].

The second count of the complaint, pleaded essentially on behalf of American Stevedoring Inc., adds the following allegations, *inter alia*:

39. In selecting Container Freight as a CES, the Customs defendants have selected a location which did not meet the criteria that an applicant be "an existing operation [and that it have] a facility with the capability of handling large volumes of cargo \* \* \*." At the time its application was submitted, Container Freight did not have

---

[3] The administrative record ("AR") consists of documents subdivided into 16 numbered parts. Those applications comprise part 4 thereof.

[4] Prior to that letter, the company had been notified by Customs that its existing CES designation would expire, effective March 2, 1994.

The reasons stated in the February 4 letter for rejection of Resources were as follows:

Your facility was not chosen since the costs associated with examinations, as presented in your application, were found to be higher than similarly located facilities that were selected to service the indirect importing community. Also, the office space identified \* \* \* to be dedicated in support of Customs Examination teams was limited.

[5] That letter went on to inform the company that the Service's

decision was attributable to several factors. Your examination fee structure established a dual rate for carriers within a similarly located geographical direct arrival area. Further, the ASI examination rate for devanning/restuffing and opening/closing multiple cartons was higher than similarly located direct arrival facilities. Also, the warehouse space dedicated for the shipping and examination of cargo was minimal. Finally, the office space dedicated to Customs examination teams was limited.

"an existing operation" in the State of New Jersey and had no facility whatsoever anywhere.

\*    \*    \*    \*    \*    \*    \*

41. Specifically, the Customs defendants disregarded the requirement of the site's accessibility to major transportation arteries, rail lines, proximity to major ocean terminals[.] American Stevedoring is under contract with Maher Terminals and has provided Maher's 24 ocean common carriers with CFS services. Maher terminals handles more than 50% of the general direct arrival/maritime cargo at the Port of New York/New Jersey.

\*    \*    \*    \*    \*    \*    \*

46. Customs has selected only one on-dock CES location \* \* \*. Because the Container Freight facility is the only carrier/CES selected, Customs is in effect awarding an unfair advantage to this location over all other carriers and terminals. By virtue of its carrier/ CES nature, Container Freight will favor its own customers when clearing containers through Customs inspections and discriminate against the containers of other carriers which do not use Container Freight's facilities.

In their memorandum in opposition to the government's instant motion, the plaintiffs further argue that Customs had advised them that rates were not to be a criteria used in selecting the CES sites; that denial of American Stevedoring's application because of dual rates was arbitrary and capricious; that the Service did not adhere to its Pipelines in making its selections; that rejection of Resources on the ground of higher rates was arbitrary and capricious; and that that company offered the most accessible facility to major transportation arteries, rail lines and other facilities and terminals.

They "do not dispute the standard of review applicable in this proceeding" and summarize their position thereunder as follows:

> There is before the Court the entire administrative record plus the proceedings in connection with plaintiffs' motion for a preliminary injunction, together with affidavits submitted in connection with the instant motion of the Customs defendants.
>
> \* \* \* [T]hat \* \* \* record is replete with instances in which the Customs defendant[s] deliberately and systematically ignored the regulations and the applicable pipelines in selecting the corporate defendants as the entities to operate the 5 CES sites in the Newark Area. The Customs defendants had an agenda which went beyond the stated one of reducing the number of CES's in the Newark area; that agenda included picking the applicants which Customs wanted to operate the CES sites, and then tailoring the requirements to fit the selectees or, if the selectees could not otherwise qualify, ignoring or dispensing with the requirements altogether.

Plaintiffs' Memorandum, p. 6. *See generally Camp v. Pitts,* 411 U.S. 138 (1973).

## II

Customs Deputy Chief Inspector Carl Johnson, who headed the Service's survey team, describes the approach taken as

5.\* \* \* two parallel Rating Systems to be used in on site inspections of the proposed facilities. The[y] \* \* \* used the same elements but had different qualifying criteria. The[y] \* \* \* evaluated the facilities based on the type of cargo that would be examined at that location. There was one rating system for Direct Arrival Facilities and a second for Indirect Arrival Facilities. Direct Arrival Facilities are used to service cargo arriving direct by ocean going vessels in the port of Newark. Indirect Arrival Facilities \* \* \* service cargo stored at C[FSes] and cargo arriving overland \* \* \*. The scoring criteria for the two rating systems differed because of the anticipated size of the facility needed based on Customs' statistics.

6. These ratings were divided into two parts, the first of which was a checklist of the minimum requirements described in the initiating pipeline. The second part consisted of an evaluation of each facility pursuant to 19 CFR 118.12, which requires an evaluation of each site to determine those sites that will "best meet the examination needs of Customs and facilitate the movement of imported merchandise." We developed a scoring system based upon the physical requirements of the facilities that would be needed to meet the examination needs of the \* \* \* Service under the current inspectional load. These requirements included Cargo Inspectional Workspace, the Number of Cargo Bay Doors, the Office Space to be provided to Customs, Electronic Capabilities of the site, Container Storage Space, etc. Each of these physical requirements was weighted according to its relative importance to efficient and effective examination by Customs \* \* \*.

\*         \*         \*         \*         \*         \*         \*

9. Based upon our on-site evaluation and the supplemental information provided by each applicant, we assigned a point score for each of the factors in the appropriate rating system for the relevant type of facility. We then multiplied that score by the weighting factor. The addition of these numbers provided a total score for each applicant.[6]

\*         \*         \*         \*         \*         \*         \*

11. At the close of the on site inspection period, I was instructed by John Leyden, Assistant Area Director for the Newark Area to identify the location of all \* \* \* CFS's[    ] so that a determination of suitability of the applicants pursuant to the geographic requirement of Pipeline 2266 could be made \* \* \* [as to] sites which are "geographically convenient to existing CDS's \* \* \* and CFS's." I prepared a map showing the location of all CFS's and CDS's in the Newark Area [and] presented [it] to John Leyden. After his review of the map, he instructed me to divide the Indirect Facility applicants into two groups based on \* \* \* Truck Route 1 & 9 and an

---

[6] *See* AR part 7 for the individual evaluation sheets.

extension of the line thereof as it passes through South Kearney, New Jersey.

12. I was instructed to * * * determine which applicants met the minimum requirements of Pipeline 2266. Based on this review, 10 applicants were found to meet the minimum requirements.

13. I prepared two documents summarizing the results of the on site evaluations and a review of the documentation provided by the applicants. One document summarized information about Indirect Arrival Facilities and the other [ ] Direct Arrival Facilities * * *.

14. Each document contained an Operational Ranking and a Cost Ranking for each relevant applicant. The Indirect Arrival Document had two separate rankings based on the North/South division of the area. The Operational Ranking was done according to the Total Score for each facility based on the appropriate Rating System. The Cost Ranking was based on the anticipated cost for a standard examination of a 40 foot container. This would consist of stripping, restuffing, opening and closing approximately fifty cartons and the attendant handling and administrative costs of the container. A review of the types of cargo imported in containers indicated that approximately 85% of containerized cargo would require this type of examination. The documents contained graphs and summaries of major components of the evaluations.[7]

The documents just referred to were then presented to Mr. Leyden and defendant Haage. The latter attempts to explain further:

8. The applicants identified as direct arrival candidates were evaluated in relation to other direct facilities; those identified as indirect arrival candidates were divided into two groups based on geography * * * [and] were evaluated in relation to other indirect facilities in their geographic group.

\*  \*  \*  \*  \*  \*  \*

10. When I received the package relating to Indirect Facilities, I reviewed * * * the map * * * showing the locations of existing CFS[es] and CDS[es] and the charts showing the number of facilities in proximity to each applicant. Based upon this information I determined that there should be two facilities in the Northern District and two in the Southern District.

11. Each applicant within the respective competitive group received two numerical rankings. One was an operational ranking and the other a cost ranking. These rankings were based upon the objective assessment of two criteria described in 19 CFR 118.12, namely what will best meet the examination needs of Customs and facilitate the movement of imported merchandise * * *. [T]hose applicants which received the lowest rank [for] either * * * operational or cost were not selected. This standard was consistently and objectively applied * * *. American Stevedoring was the lowest in the Direct Facility category in both operational ranking and cost

---

[7] Customs Service Defendants' Motion for Judgment on the Agency Record, or, in the Alternative, for Summary Judgment ("Defendants' Motion"), Declaration of Carl Johnson, pp. 2, 3–4. *See* AR parts 8 and 9.

ranking. In the Indirect Facility category, Resources was the lowest in opererational ranking and the next to the lowest in cost ranking.[8]

Whereupon American President Lines, Ltd., East Coast Warehouse & Distribution Corp., Rail Head Transfer, Inc., Container Freight Services, Inc. and H & M International Transportation, Inc. were selected to be the new CESes.

## A

During the application process, according to the plaintiffs, Customs claimed that fees would not be a factor in the selection of sites. Counsel point to testimony of officers of their clients before the court as well as to affidavits subsequently obtained from two other individuals[9] allegedly familiar with the process. Plaintiff American Stevedoring Inc. further responds that the Service's nonselection of it because of dual rates was arbitrary and capricious since the "administrative record reflects that Customs never advised any of the applicants that dual rates were a disqualifying element" and that two selected, namely, Container Freight Services, Inc. and H & M International Transportation, Inc., also proposed dual rates. Plaintiffs' Memorandum, p. 10. The plaintiffs challenge the Service's cost-ranking approach, which addressed only the anticipated cost of a standard examination of a 40-foot container:

> First, there is nothing in the administrative record on which the Customs defendants rely to support the contention that "approximately 85% of containerized cargo would require this type of examination". Second, there was no prior notification [to] the applicants that this was to be the analysis used. Third, there was no prior notification [to] the applicants that the majority of the rate information sought by Customs was going to be ignored.

*Id.* at 13.

As against defendant Container Freight Services, the plaintiffs complain that it was not in existence at the time of its application to become a CES.[10] They further respond that

> there was no indication in the pipelines or in any other correspondence and communication with Customs that there was to be a distinction in the application analysis between direct and indirect facilities; that there was to be a geographical north-south division at Routes 1 and 9; or that the applicants who were located in the northern segment would be competing only against others in the north, and those in the south would be competing only against others in the south.

---

[8] Defendants' Motion, Declaration of Kathleen M. Haage, pp. 3, 4.

[9] One of these affiants, an officer of another, unsuccessful CES applicant, recognized, however, that "the needs of Customs w[ere] paramount to the choice of the applicants." Affidavit of Robert J. O'Neill in Opposition to the Customs Defendants' Dispositive Motion, para. 3. This assertion is repeated in Plaintiffs' Memorandum, p. 9.

[10] Pipeline No. 2266 stated (at page 3) that "an applicant must have an existing operation and a facility with the capability of handling large volumes of cargo and to hold cargo intact".

The record shows that Stevedoring Systems, Inc., a wholly-owned subsidiary of Sea-Land Service, Inc., and Universal Maritime Service Corporation, a subsidiary of Maersk, Inc., each an established terminal operator, decided to submit a joint CES application in the name of Container Freight Services, Inc., to be formed if and when selected as a CES. That name, but not the venture, was changed to Select Cargo Services, Inc. in early 1994.

*Id.* at 16. In addition, the plaintiffs argue that it "is in the assignment of the points and in the weighting of the score for the various categories that the arbitrary and capricious nature of the application analysis is most clearly revealed." *Id.* at 17. For example, they claim that, while the requirements outlined in the pipelines were "amorphous", the final results were quite specific. *Id.*

## B

The position of Customs is that the plaintiffs have failed to distinguish the factors considered in the operational evaluation as opposed to cost. While the former did not consider rates, the latter was based on data submitted by the applicants.[11] Moreover, the Service submits that, even if it had not relied on a cost evaluation, the plaintiffs still would not have been selected because both had lower operational scores than other applicants. *See* Defendants' Motion, p. 10.

Second, Customs argues that plaintiffs' contention that they should have been notified that dual rates were a disqualifying element is misplaced: "[D]ual rates did not *ipso facto* disqualify ASI or any other applicant, but w[ere] considered along with other factors in evaluating the applicant." Defendants' Reply Brief, p. 4. In addition, the Service submits that none of the sites selected actually charges dual rates, which it defines as two different rates for "carriers within a similarly located geographical direct arrival area". *Id.*

Third, Customs asserts that defendant Container Freight Services, Inc. did indeed satisfy the reference in Pipeline 2266 to "an existing operation and a facility with the capability of handling large cargo and to hold cargo intact". This reference was designed to insure that applicants "demonstrate work-related experience in cargo handling"[12], not a prior corporate existence. Defendant Haage further explains that:

> 3. Pipeline #2113, dated January 2, 1991 announced the initial (and subsequently aborted) solicitation for CES applicants * * *. [T]he qualifying criteria specified "* * *an existing, on-going operation". The subsequent deletion of that language from Pipeline #2266 was deliberate. The objective was clearly focused on motivating and promoting partnerships within the maritime industries. Utilizing the industry concept of rationalized service * * * as a frame of reference, it was clearly our intention to support private sector initiatives of experienced operations to formulate cooperatives and/or joint venture approaches to the CES program * * *.
>
> 4. Given that operational framework, Customs concluded that if the parent organizations * * * satisfied the experience criteria, then it is a logical extension of that rationale that the partnership of those two would be the beneficiary of that joint experience and thus meet the criteria of being an existing operation. In my judgment

---

[11] *See* Defendants' Motion, Declaration of John P. Leyden, p. 3; Supplemental Declaration of Carl Johnson, p. 2.

[12] Defendants' Motion, Supplemental Declaration of Kathleen M. Haage, para. 2.

Container Freight Services satisfied the requirement of being an existing operation for CES consideration.

5. The term facility was utilized to demonstrate our position that the operation of a CES must take place at a location created to serve the particular function of handling intensive cargo examinations. It was intended to dismiss the promises of "build to suit" as well a[s] to deter those applicants [   ] whose facilities provided an insufficient work area to devan cargo.[13]

Lastly, the Service submits that Pipeline 2266 clearly indicated that geographical convenience to existing CDSes and CFSes would be considered, and that the other considerations could only abide filing of the actual applications.

### III

In *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86 (1974), the Supreme Court summarized the appropriate scope of judicial review per the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), as follows:

Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment * * *. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* * * * [401 U.S. 402,] 416 [1971]. The agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 (1945).

On the record at hand, this court cannot conclude that the selections of Customs under review were arbitrary and capricious. That is, there appears to be a rational connection between the facts found and the choices made.

Pipeline 2266 requested a "schedule of fees clearly showing what the applicant will charge for each type of service" and pointed out that the information provided "shall constitute criteria used to judge the application." Section 118.11 of Title 19, C.F.R., which governed the CES application process, contained identical language. To the extent the plaintiffs refer to meetings with Customs, they were addressing solely operational, not cost, evaluation. The latter, by definition, examined the fee structure of all the applicants. In light of this fact, coupled with the indication in both Pipeline 2266 and the governing regulation that costs

---

[13] *Id.* at pp. 1–2.

would be considered, this court cannot conclude that the Service's consideration of fee structures was arbitrary and capricious.

Contrary to plaintiffs' position, nothing in the record establishes that Customs automatically disqualified an applicant for dual rates. Indeed, in its letter dated February 8, 1994 the Service informed American Stevedoring Inc. that its application had met the "basic conditions set forth in * * * Pipeline 2266". While it is undisputed that Customs viewed such rates as less preferable, the plaintiffs have not demonstrated that this was a disqualifying factor. Rather, the record reflects that it was just one of a number of factors considered. And the court, again, is unable to conclude that that consideration was arbitrary and capricious.

The same must be said for the evaluation of the operational component. Failure to provide applicants with an advance, detailed explanation of how the Service intended to evaluate each facility offered and to allocate points does not render the determination arbitrary and capricious. Of course, the law did not require Customs to provide the applicants with that degree of probable analysis. On the other hand, the record is possessed of a rational relationship between the criteria relied upon and the weights given them.

With regard to the reference in Pipeline 2266 to "an existing operation and a facility with the capability of handling large cargo", the court finds that the Service's intention was to insure that applicants demonstrate experience in cargo handling. Earlier Pipeline 2113 referred to "an existing, on-going operation". Deletion of "on-going" upon promulgation of No. 2266 was deliberate and designed to "support private sector initiatives of experienced operations to formulate cooperatives and/or joint venture approaches to the CES program." Indeed, the plaintiffs do not contend that Stevedoring Systems, Inc. and Universal Maritime Service Corporation, the parent organizations of defendant Container Freight Services, do not have extensive experience in cargo handling, nor could they.[14] Furthermore, the site secured for the joint venture had been alternatively a CDS and a container stuffing and unstuffing facility for many years. In short, the court concludes that the selection of Container Freight Services was not an arbitrary and capricious decision on the part of Customs.

## IV

In view of the foregoing, the Customs Service Defendants' Motion for Judgment on the Agency Record or, in the Alternative, for Summary Judgment must be granted and this action dismissed.

---

[14] *See, e.g.*, Defendants' Motion, Declaration of William A. Hamlin.